# IN THE COURT OF APPEALS OF IOWA

No. 21-1675
Filed January 11, 2023

**STATE OF IOWA,**
          Plaintiff-Appellee,

**vs.**

**TRYMAINE DURYELLE BOSTIC,**
          Defendant-Appellant.
_____

          Appeal from the Iowa District Court for Clinton County, Henry W. Latham

Judge.


          Trymaine Bostic appeals the trial court's denial of his motions to continue

and for mistrial and also challenges the sufficiency of the evidence to support his

convictions for child endangerment causing bodily injury and child endangerment.

**AFFIRMED.**


          Martha J. Lucey, State Appellate Defender, and Robert P. Ranschau,

Assistant Appellate Defender, for appellant.

          Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee.


          Considered by Bower, C.J., and Greer and Badding, JJ.

**BOWER, Chief Judge.**

Trymaine Bostic appeals the trial court's denial of his motions to continue and for mistrial and also challenges the sufficiency of the evidence to support his convictions for child endangerment causing bodily injury and child endangerment. In voluntarily absenting himself after the first day of trial, Bostic cannot complain the court violated his constitutional right to be present when it denied the motions to continue and for mistrial. There is substantial evidence to support each of the convictions, and accordingly, we affirm.

**I. Background Facts**

On July 7, 2015, Trymaine had an altercation with his wife, Jodi,[1] when Trymaine came to Jodi's parents' home and tried to take his two children—A.B, two years old, and T.B., one year old—with him. He was charged in count 1 with burglary in the first degree; in count 2, child endangerment causing bodily injury to T.B. as a habitual offender; in count 3, child endangerment causing bodily injury to A.B. as a habitual offender; in count 4, domestic-abuse assault causing bodily injury to Jodi; and count 5, assault causing bodily injury to Jodi's sister, Jami.

The jury trial began on September 19, 2016. Trymaine was present and represented by counsel.

Jodi testified she and Trymaine were married and had a home in Fulton, Illinois, which they shared with their two children, A.B. and T.B., and Trymaine's older child, K., age seven. Trymaine had not worked for "a few years," and Jodi paid the family bills, including the rent on their home in Fulton, Illinois. Jodi's

---

[1] Many of the people involved share a surname and, for ease of reference, we will refer to them all by their first names.

parents, Angela and Scott, lived about ten miles away in Camanche, Iowa, south of Clinton. Jodi had been working in North Dakota for several months, traveling back and forth between North Dakota and Fulton. Before July 5, Jodi informed Trymaine she would not be sending as much money because she was trying to get a home ready in North Dakota for herself and the children and she could not afford to support both homes.[2]

On Sunday, July 5, 2015, Trymaine called Jodi in North Dakota and was "furious" she was not going to send more money. Trymaine told Jodi the water had been shut off at the house in Fulton, the electric bill was in arrears, and the power was going to be shut off. Trymaine told her that if she did not send more money, he was going to take the children to Texas the following Sunday and she wouldn't see them again. Jodi told Trymaine she would arrive in Illinois by train on July 8.

Jodi called the Fulton police to ask if Trymaine could take the children to Texas without her authorization. She was told that in the absence of a custodial order, either parent had that authority. Jodi "panicked." She flew from North Dakota to the Clinton area on July 6. Jodi and Angela drove to the Fulton police department to inform them Jodi was picking up her children. An officer accompanied her to the Fulton house where the children were with a childcare provider since Trymaine had found employment and was working the third shift.

---

[2] Jodi said she and Trymaine "as a couple were not working" but she had informed him she would help him find work in North Dakota and wanted the children to continue to have a relationship with their father.

The officer talked with the provider, and Jodi packed some clothes and took the three children back to Iowa.

When Trymaine learned Jodi had picked up the children and left, he went to the Camanche police and was escorted to Angela and Scott's home to retrieve K. Jodi, Angela, and the children were not there, but Scott was; he called Jodi and told her the police were looking for her. Jodi met an officer at a truck stop, and K. was returned to Trymaine. Jodi and the other two children arrived at Jodi's parents' home at around 3:00 a.m.

At about 11:30 a.m. on July 7, Angela testified she was leaving her driveway and saw Trymaine in the passenger seat of a vehicle coming toward the home. Angela recognized the vehicle as belonging to Trymaine's aunt. Angela called Scott and then tried to call Jodi, Jami, and her son, Kylr, who were also at the house. She then called 911, turned around, and went back home. By the time Angela got back to the house, her daughters and grandchildren were all crying. Trymaine and the vehicle were gone.

Jodi testified she was bathing A.B. and T.B. when Trymaine arrived. Kylr told her Trymaine was at the door of the home. Jami told Jodi to shut and lock the bathroom door. Jodi did so. The children were still in the bathtub. Jodi heard scuffling in the hallway outside the bathroom, and then Trymaine "barged through the bathroom door." Jodi yelled at Trymaine, asking him "what the hell" he was doing. Jodi was facing Trymaine, with the children behind her in the tub. Trymaine shoved Jodi and she fell and landed in the bathtub on top of two-year-old A.B. Trymaine reached around Jodi and pulled one-year-old T.B. out of the tub by the

arm. Jodi stated Trymaine "yanked [T.B.] hard" and she heard a "pop" and thought it came from T.B.

Trymaine was holding T.B. close to his chest. Jodi got up and tried to get T.B. back from Trymaine. Jodi had one arm "intertwined" with Trymaine and they were pushing and shoving; Jodi was concerned Trymaine might drop the wet T.B. onto the tile floor. Jodi was able to wrest T.B. away from Trymaine. She put T.B. on the floor in the hallway outside the bathroom and "threw herself on top of [the child]." Trymaine tried to get to T.B.—in the process he kicked Jodi in the side and in the face. Jodi was able to get up with T.B., run behind Jami in the hallway, and get T.B. to a bedroom where she hid T.B. on the floor between the bed and the wall.

When Jodi came back out of the bedroom, Trymaine and Jami were gone. Jodi looked into the bathroom and did not see A.B. anywhere. Jodi could hear Jami yelling but did not know where she was. Jodi ran out the front door and saw Trymaine's aunt's vehicle parked across the street with Trymaine's brother, Tevin, in the driver's seat. As Jodi started to run towards the vehicle, she saw Trymaine run around from the side of the house holding wet, naked, and crying A.B. Jami was chasing Trymaine.

Jodi ran to the driver's door of the vehicle. She was able to open the door—despite Tevin trying to hold it shut—reach over Tevin, and pull the keys out of the ignition. She and Tevin then struggled for possession of the keys.

Trymaine threw A.B. into the rear passenger seat; A.B. was crying and screaming. Jami caught up and was struggling with Trymaine on the passenger side of the vehicle; Jodi and Tevin were wrestling over the keys on the driver's

side. Kylr came out of the house, reached into the vehicle, and got A.B. out. Jodi told him to run. As soon as Jodi saw that Kylr and A.B. were in the house, Jodi let go of the keys and backed away from Tevin. Jami and Trymaine also separated, and Jodi walked over towards Jami. Trymaine walked to the back of the vehicle and said, "This ain't over bitch." He and Tevin then drove away.

Jodi went back into the house. The children were "worked up, crying, hysterical." The women wrapped the children in towels, and Jodi attempted to calm them and herself. Jodi observed that both children had marks on them. The police arrived and took photographs of T.B.'s injuries.

Court was adjourned for the day after Jodi's testimony. The court advised the jury and the parties that trial would reconvene the following morning "and hopefully we will be able to begin the trial sharply at 9:00." The court again instructed the attorneys and Trymaine to arrive at 8:45 a.m. so they could start "promptly" at 9:00.

Trymaine did not appear the second day of trial. At 10:10 a.m., outside the presence of the jury, Trymaine's attorney stated his office had attempted to call Trymaine on his cell phone but the calls had gone to voicemail. Counsel also advised he or someone from his office had contacted the hospital and learned Trymaine had not been admitted. They tried the emergency room to see if Trymaine was a patient.[3] Emergency room staff would not say whether Trymaine was there, so they left a message that if he was there, he was to call his attorney's office right away—Trymaine did not call his attorney. Defense counsel also stated

---

[3] Defense counsel stated Trymaine had a collapsed lung the week before trial.

he advised Trymaine the day before that Tevin was going to be a witness and asked if a subpoena was needed. Trymaine told his attorney it was not needed; Tevin would be at court at noon.

The prosecution resisted a continuance, noting Trymaine knew he was to be present and had a working cell phone the day before.

The court noted it had "advise[d] both counsel of Rule of Criminal Procedure 2.27(2) as to potentially proceeding in the absence of the defendant in this case." The court stated "at this point I could make a finding that it is voluntary" but in light of a possible health concern, they would tell the jury to return at 1:30 p.m. and defense counsel was to try to locate Trymaine and ascertain his availability for trial. Defense counsel's motion to continue was denied.

At 1:30 p.m., again outside the jury's presence, defense counsel stated:

> Here's the situation, Your Honor. When I got back, I called his cell phone number and I left a message. I also sent a text. The message and text were essentially the same, You need to be here by 1:15. If you are not, the court is going to—well, I said that you were going to proceed without him. I guess I made that conclusion on my own. I told him that he would lose his right to challenge the State's evidence and that he needed to call me immediately. I left my phone number both in the message and in the text.
> And then I went through my records. The only addresses I have for Trymaine were the address in Fulton and then one in Garland, Texas, which obviously I didn't have time to check that. His brother was arrested at the same time he was and the address his brother gave at the time was [XXX]. I went down there, knocked on the door, no answer. I don't know if he still lives there. That was [fifteen] months ago. That was the only other lead I had.

Defense counsel stated he had not been contacted by any of Trymaine's family members. He asked for a mistrial.

The court stated it had reviewed the rules of criminal procedure and case law and denied the motion for mistrial. The court noted there had been no medical

reports of a collapsed lung presented and Trymaine appeared healthy the day before. The court found Trymaine's absence was voluntary, he knew he was to be present by 8:45 a.m., and defense counsel had made diligent efforts to locate Trymaine. The court further found:

> [Trymaine] has deliberately absented himself without any good cause that I can tell from this trial and there is good reason for this trial to continue based on the comments made by [the prosecutor]. Primarily that this case has been on file for well over a year, there have been witnesses that have traveled many miles to be here to testify. And for those reasons the trial will proceed in his absence.

The court issued a warrant for Trymaine's arrest.[4]

> Trial resumed without Trymaine. The court instructed the jury:

> [T]he defendant in this case has chosen to waive his constitutional right to be present for the duration of this trial. Under the law, this trial is allowed to proceed without his presence. No inference should be made pertaining to his guilt or innocence due to his lack of presence at this trial, nor should you speculate or infer any opinions the court may have on the defendant's guilt or innocence based on the court's decision to proceed without the defendant's physical presence. Your duty remains the same, to be the judges of the facts in this case based on the evidence presented in this courtroom.

Jami testified she and her young children were visiting Jodi at their parents' home on July 7 when she heard a knock on the door. Kylr stated it was Trymaine. Jami, holding her month-old infant, looked out and saw an "angry" looking Trymaine. She went to the bathroom and told Jodi to shut and lock the door. Trymaine came through the front door and down the hallway and asked Jami "where the fuck are my kids." Before she answered, Trymaine "threw [her] to the side." She hit a door jamb with her arm while trying to protect her infant. Jami described how Trymaine "shoved himself through" the bathroom door, threw Jodi

---

[4] The warrant was not served until August 2021.

into the tub, and yanked T.B. by the arm out of the tub. T.B. was "crying and screaming" and so was A.B.

Jami put her child down and went back to try to help Jodi. She saw Jodi on the ground huddled over T.B. Trymaine was kicking Jodi so Jami jumped on him. Trymaine threw her off his back and he got A.B. out of the tub. Jami was unable to stop Trymaine, and she then heard Scott ask Trymaine what he was doing. Trymaine left the house out of the back sliding doors with A.B., and Jami chased after him. She described the ensuing scuffling on the street and Kylr retrieving the child from the car. Jami testified T.B. had marks on her back and on her face and A.B. had marks on her back. A picture of T.B.'s back was admitted into evidence.

Scott testified Jodi, Trymaine, and the children had lived with him and Amanda in 2012 but Trymaine did not come and go as he pleased after moving out. Kylr testified that when he saw Trymaine at the front door, he went to tell Scott, who was in the shower. When Kylr went back out to the hallway, he saw Trymaine "walk into the bathroom, reach into the bathtub, grab [A.B.] . . . out of the bath, run through my living room[,] and out the sliding glass door." He heard Scott tell Trymaine to stop; Trymaine stopped briefly at the back door but left. Kylr testified he "[p]anicked for a minute," and then he made his way out the front door and saw A.B. in the passenger seat of the vehicle across the street. Kylr grabbed the child and ran to the house, and he and Scott locked the front door after they got inside. A neighbor also testified about her observations that day. The jury was released for the day.

Trymaine again did not appear at trial the next day and had not contacted defense counsel. The prosecution rested.

The defense called Tevin as a witness. Tevin testified Trymaine asked him for a ride on the morning of July 7, saying he needed to talk to the children's grandfather. Tevin did not believe Trymaine was agitated. They drove to Camanche, and Tevin parked across the street from Scott and Angela's house. Tevin testified he and Trymaine saw Angela leaving, but Trymaine noted Scott's truck was there. Tevin waited in the car while Trymaine went inside the house. After a few minutes Tevin saw Jodi running out of the house. He stated, "She came directly over to the car across the street and opened my door. And the keys were still in the ignition, and she grabbed the keys out of the ignition and tried to pull them out of the car." They tussled over the keys, and then "everybody was outside," "her sister, her brother, and [Trymaine] had the baby in his arms." Tevin testified Jodi's brother reached through the driver's side rear door, reached across the seats, and pulled the baby out through the window by the child's arm. Then Jodi released the keys, and he and Trymaine left. The defense then rested. The defense's motions for judgment of acquittal were denied.

On count 1, the jury found Trymaine not guilty of burglary but guilty of the lesser-included offense of assault. The jury also found Trymaine guilty of child endangerment causing bodily injury to T.B. on count 2 and, on count 3, guilty of the lesser-included offense of child endangerment concerning A.B. Trymaine was found not guilty on counts 4 and 5. Trymaine was located in 2021, and the court imposed sentence with him present. He now appeals.

Trymaine contends the court violated his right to be present when it denied the motions to continue and for mistrial. He also asserts there is insufficient evidence to support either of the child-endangerment charges.[5]

**II. Standards of Review**

"We generally review a district court's denial of a motion for continuance for an abuse of discretion." *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012). We reverse only if the denial was based "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *See State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003). Because the decision "lies within the broad discretion of the trial court," we do not disturb the court's ruling "unless an injustice has resulted." *State v. Leutfaimany*, 585 N.W.2d 200, 209 (Iowa 1998). On appeal, Trymaine asserts proceeding in his absence violated his right to be present. We review constitutional claims de novo. *State v. Hurlbut*, 970 N.W.2d 259, 264 (Iowa 2022).

We review sufficiency-of-the-evidence claims for correction of errors of law. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005). "If the verdict is supported by substantial evidence we will uphold a finding of guilt." *Id.* (citation omitted). "Substantial evidence" is evidence that would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *Id.*

**III. Discussion**

*Right to be present.* The defendant's right to be present is implemented in Iowa Rule of Criminal Procedure 2.27. *See State v. Hendren*, 311 N.W.2d 61, 62 (Iowa 1981); *accord Hurlbut*, 970 N.W.2d at 264 ("Every criminal defendant

---

[5] The conviction for assault is not challenged.

possesses the right to due process through presence at his trial and the right to confront the State's witnesses against him. U.S. Const. amends. V, VI, XIV; Iowa Const. art. I, §§ 9, 10. Rule 2.27 implements the constitutional presence right."). "Like any personal constitutional guarantee, a defendant's right to be present at trial can be waived." *Hedren*, 311 N.W.2d at 62; *Hurlbut*, 970 N.W.2d at 266 ("Due process and confrontation are, without question, fundamental rights. But these rights may be lost through a defendant's voluntary conduct." (internal citations omitted)).

Rule 2.27 provides:

> (1) In felony cases the defendant shall be present personally or by interactive audiovisual closed circuit system at the initial appearance, arraignment and plea, unless a written arraignment form as provided in rule 2.8(1) is filed, and pretrial proceedings, and shall be personally present at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule. . . . .
> (2) In all cases, the progress of the trial or any other proceeding shall not be prevented whenever a defendant, initially present:
> (a) Is voluntarily absent after the trial or other proceeding has commenced.

Whether we view the issue as one of waiver or of forfeiture,[6] we review the facts on which the trial court's finding of voluntariness was made de novo.

---

[6] The *Hurlbut* court adopted the forfeiture approach. 970 N.W.2d at 266 ("We believe that forfeiture provides the appropriate analytical framework under the circumstances of this case." (citing 6 Wayne R. LaFave, *Criminal Procedure* § 24.2(d) (4th ed. 2015)).

The cited section of LaFave states:

> In *Taylor v. United States*, the Court held that the defendant can also lose his right to be present by absenting himself during the trial. In rejecting the defendant's contention that "his mere voluntary absence from his trial cannot be construed as an effective waiver . . . unless it is demonstrated that he knew or had been expressly warned

*Hendren*, 311 N.W.2d at 62. "[F]or the absence to be deemed voluntary the defendant 'must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away.'" *Id.* (citation omitted); *Taylor v. United States*, 414 U.S. 17, 19 n.3 (1973) (stating that for the absence to be deemed voluntary, the defendant "must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away" (citation omitted)).

Trymaine was present for the first day of trial and the testimony of Angela and Jodi—he clearly was aware the trial was taking place. He knew he was to be present the second day of trial, having been informed to be at court by 8:45 a.m. by the court and his attorney. The court provided defense counsel time and opportunity to determine whether Trymaine's nonattendance was because of hospitalization or another emergency. *See Hurlbut*, 970 N.W.2d at 267 (noting

---

by the trial court not only that he had a right to be present but also that the trial would continue in his absence and thereby effectively foreclose his right to testify and to confront personally the witnesses against him," the Court noted:

> It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial, . . . entertained any doubts about his right to be present at every stage of his trial. It seems equally incredible to us . . . "that a defendant who flees from a courtroom in the midst of a trial—where judge, jury, witnesses and lawyers are present and ready to continue—would not know that as a consequence the trial could continue in his absence."

Because this analysis is also difficult to square with traditional waiver-of-rights theory, here again it would seem preferable to view the matter in terms of forfeiture of a right by misconduct.

LaFave, *Criminal Procedure* § 24.2(d) (alterations in original) (footnotes omitted).

those absences would be considered involuntary). There was no indication Trymaine's absence was involuntary. On our review, because Trymaine was voluntarily absent after the trial commenced, his right to be present was not violated when trial continued in his absence.

*Sufficiency of the evidence.* The jury instructions related to counts 2 and 3 were the same, with the exception of the child in question; count 3 substituted A.B. in each place T.B. was listed:

> Under Count 2 the State must prove all of the following elements of child endangerment resulting in bodily injury:
> 1. On or about July 7, 2015, the defendant was the parent or person having custody or control of T.B.
> 2. T.B. was under the age of fourteen years.
> 3. The defendant acted with knowledge in any one of the following ways:
> (a) By creating a substantial risk to T.B.'s physical, mental or emotional health or safety; or
> (b) By an intentional act or series of intentional acts, uses unreasonable force, torture or cruelty that results in bodily injury; or
> (c) By an intentional act or series of intentional acts, evidences unreasonable force, torture or cruelty which causes substantial mental or emotional harm to a child or minor.
> 4. The defendant's act or acts resulted in bodily injury to T.B.
> If the State has proved all of the elements, the defendant is guilty of Child Endangerment Resulting in Bodily Injury under Count 2. If the State has proved elements 1, 2, and 3, but has failed to prove T.B. suffered any injury under element 4, the defendant is guilty of Child Endangerment. If the State has failed to prove element 1, 2, or 3, the defendant is not guilty under Count 2.

Trymaine acknowledges the first two elements were met for both counts 2 and 3. But he contends there is insufficient evidence he knowingly created a substantial risk to either child's physical, mental, or emotional safety or that his acts resulted in "bodily injury" on T.B.

In conducting a sufficiency-of-the-evidence review, "we are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is

supported by substantial evidence." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (citation omitted).

We have already set out the evidence rather extensively. On our review, we conclude a jury reasonably could have found that Trymaine created a substantial risk to both children's physical safety or emotional health when he shoved their mother into the tub where they were bathing. The jury could reasonably find he created a substantial risk to T.B.'s physical safety when he yanked the child out of the tub by the arm. The jury could reasonably find he created a substantial risk to T.B.'s physical safety or emotional health when he wrestled with Jodi for control of T.B. and when he was kicking Jodi while the child was under her on the floor. The jury could reasonably find he created a substantial risk to A.B.'s physical safety when he struggled with Jodi and Jami in the hallway, or in leaving the two-year-old alone and unsupervised in the bathtub, or when he carried her wet and crying out of the house and threw her into the vehicle. Simply stated, how could he *not* know his actions created risk of physically, mentally, or emotionally harming his children? There is substantial evidence to support both convictions for child endangerment.

We turn to Trymaine's contention that there is insufficient evidence his actions resulted in "bodily injury" to T.B. The jury was instructed, "The term 'bodily injury' means physical pain, illness or any impairment of physical condition." The jury could reasonably find Trymaine caused a bodily injury to T.B. when he yanked

the child out of the tub by the arm, causing it to "pop." The jury also could have easily found he caused a bodily injury to T.B. based on Jami's testimony the child had red marks on her face and back, the photo of the red marks on T.B.'s back, and the testimony the child was crying. In *State v. McKee*, 312 N.W.2d 907, 913 (Iowa 1981), our supreme court adopted the Model Penal Code's definition of bodily injury explaining

> Bodily injury ordinarily "refers only to injury to the body, or to sickness or disease contracted by the injured as a result of injury." Injury includes "an act that damages, harms, or hurts: an unjust or undeserved infliction of suffering or harm . . . ." Thus the ordinary dictionary definition of bodily injury coincides with the Model Penal Code definition of the term.

*Id.* (internal citations omitted). "[W]elts, bruises, or similar markings are not physical injuries per se but may be and frequently are evidence from which the existence of a physical injury can be found." *State v. Gordon*, 560 N.W.2d 4, 6 (Iowa 1997) (citation omitted). The jury could infer one-year-old T.B. suffered pain in her arm, back, or face. There is substantial evidence to support the jury verdict of guilty on count 3. We affirm.

**AFFIRMED.**